UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

UNITED STATES OF AMERICA,

v.  Case No. 8:23-cr-351-VMC-SPF

JAMES FALZONE,

    Defendant.
_____/

## REPORT AND RECOMMENDATION

Before the Court is Defendant James Falzone's Motion to Suppress (Doc. 25) evidence derived from the search of his cell phone, the United States' Response in Opposition (Doc. 35), and Falzone's Reply (Doc. 40). The Court held an evidentiary hearing on June 20, 2024 (*see* Doc. 75).

Upon Falzone's reentry to the United States at Port Canaveral after an international cruise, law enforcement seized Falzone's cell phone and transported it to a Homeland Security field office approximately 140 miles away for a forensic search. Falzone contends the United States' search and seizure of his cell phone was an improper and illegal extended border search. The United States responds that the forensic search of Falzone's phone falls within the border search exception to the Fourth Amendment warrant requirement. The Court agrees with the United States and, therefore, recommends Falzone's motion be DENIED.

## FINDINGS OF FACT

On October 3, 2023, a federal grand jury charged Defendant by Indictment (Doc. 1) with one count of receipt of child pornography and one count of possession of child pornography. This case arose from an investigation in Pretoria, South Africa, in February

2022. There, the United States Department of Homeland Security, Homeland Security Investigations ("HSI") assisted the South African Police Service with the arrest of a South African national for possession and distribution of child pornography. As part of its investigation and with the arrestee's consent, HSI Special Agents in Pretoria ("HSI Pretoria") assumed the South African national's identity in a mobile application called Viber (Doc. 35-1).

HSI Special Agent Sara Angelosanto testified that Viber is an Israel-based messaging platform that uses end-to-end user encryption. Users are registered and identified through a cellular telephone number. In addition to messaging, the application allows users to share photos and videos. Users may also create and join group chats, which may be public or private (where membership is by invitation only). When a user sends a message or media in a group chat, such as a photo or video, it is visible to all members of the group. One of the private group chats that HSI Pretoria investigated was called "sexo por gay puto boys hots." The group was created on May 23, 2021, and had 87 members. The group was active and users openly discussed and shared images of child pornography. Indeed, SA Angelosanto testified that she observed approximately 30 images of child pornography in the "sexo por gay puto boys hots" group chat.

One participant in "sexo por gay puto boys hots" group chat went by the username "Joshua." Agents observed that the "Joshua" account was registered to phone number +1 (615) xxx-4024, and "Joshua" last accessed Viber on September 8, 2022 (Doc. 35-2). On or about May 12, 2022, HSI Pretoria received a summons response from Charter Communications for subscriber information linked to phone number +1 (615) xxx-4024.

(Doc. 35-3). The customer's name for that phone number came back to Defendant, James Falzone, with a service address of Wild Coffee Ave., Wimauma, FL 33598. (Doc. 35-1). Because the individual believed to be "Joshua" lived in the Tampa area, the information was sent SA Angelosanto in the Tampa field office. In September 2022, SA Angelosanto searched Florida's Driver and Vehicle Information Database ("DAVID"), which confirmed that an individual named James Michael Falzone was living at that address.

The next month, SA Angelosanto received notification that Falzone had left the country aboard a cruise ship and would return to the United States on October 31, 2022, at the seaport in Port Canaveral, Florida. On that day, as Falzone and his fiancé departed the cruise ship, security escorted them to the Customs and Border Protection ("CBP") officers for screening. CBP Officers asked Falzone to place his cell phone, an Apple iPhone 8, in airplane mode. When Falzone opened the settings application on the iPhone, rather than placing the phone in airplane mode as requested, Falzone held the phone for an extended time and moved his thumb up and down over the screen. SA Angelosanto, who observed Falzone from behind, grew concerned about Falzone's actions because there is a wipe your phone option within the settings application. To preserve evidence, SA Angelosanto took the phone from Falzone and placed it in airplane mode. (Doc. 35-5).[1]

SA Angelosanto then interviewed Falzone after reading him his *Miranda* rights. Falzone confirmed that he lives at Wild Coffee Ave., Wimauma, FL and that his phone number is +1 (615) xxx-4024. SA Angelosanto showed Falzone a screenshot of the "sexo por

---

[1] SA Angelosanto testified that, as an HIS special agent, she has the authority to conduct boarder searches.

3

gay puto boys hots" group on Viber, which included an image of child pornography. The participants, to include "Joshua," with phone number +1 (615) xxx-4024, could be seen on the right-hand side of the group. SA Angelosanto asked Falzone whether he was aware of this group. Falzone again confirmed that it is his phone number and stated that he was aware of the group. When SA Angelosanto asked him about his involvement in the group, Falzone asserted his right to silence (Doc. 35-6); SA Angelosanto could not ask Falzone for his phone's passcode.

After the interview, CBP Officers placed Defendant and his fiancé in a waiting room. A CBP Officer overheard them speaking to each other in Spanish. Falzone was heard to say, "we have to talk when we get outside. I understand if you don't want to marry me now." (Doc. 35-7).

Without the phone's passcode, CBP facilities at Port Canaveral did not have the appropriate technology to search Falzone's phone. SA Angelosanto attempted to search the phone by using the Cellebrite software on her laptop, but it did not work. HSI detained Falzone's phone and (with the chain of custody documented) transported it to the HSI Tampa office, approximately 140 miles away (Doc. 35-5). The phone remained in airplane mode from the time HSI took possession of it, until HSI performed the forensic search two days later, on November 2, 2022. The forensic search revealed over 166 images and videos of child pornography in the phone. The phone never cleared customs and remains in the Government's possession.

## ANALYSIS

Falzone argues HSI's search of his phone violated the Fourth Amendment because it was an extended border search unsupported by either probable cause or reasonable suspicion. Falzone also contends the search violated the Fourth Amendment because HSI seized his phone on October 31, 2022, yet never applied for a warrant to search it. According to Falzone, the justification for the border search evaporated at some unspecified point after HSI seized his phone and arrested him, but HSI improperly used the warrantless cover of the border search exception for law enforcement purposes (*see* Docs. 25, 40). The Government responds that the extended border search doctrine does not apply. It contends that HSI's search of Falzone's phone was a border search, full stop, and it did not need probable cause or reasonable suspicion to search it. Even if the Fourth Amendment required reasonable suspicion in this circumstance – the Government argues – HSI had it (Doc. 35). The Court agrees with the Government.

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The basic purpose of the Fourth Amendment is to "safeguard the privacy and security of individuals against arbitrary invasions by governmental officials." *Carpenter v. United States*, 138 S. Ct. 2206, 2213 (2018) (quoting *Camara v. Mun. Ct. of City and Cnty. of San Francisco*, 387 U.S. 523, 528 (1967)). A border search, however, is a "historically recognized exception" to the Fourth Amendment's warrant requirement. *United States v. Ramsey*, 431 U.S. 606, 621 (1977). It is grounded in "the longstanding right of the sovereign to protect itself by stopping and examining persons and property crossing into this country." *United States v. Flores-Montano*,

541 U.S. 149, 152-53 (2004) (quoting *Ramsey*, 431 U.S. at 616).  Routine searches and seizures at the border are exempted from standard Fourth Amendment requirements so the government can "prevent the introduction of contraband" into the country and bar entry by those who would bring harm across the border, "whether that be communicable diseases, narcotics, or explosives."  *United States v. Montoya de Hernandez*, 473 U.S. 531, 537 (1985). "[C]hild pornography, no less than drugs or other kinds of contraband, is prohibited from 'enter[ing] the country," whether as digital files or physical photographs.  *United States v. Touset*, 890 F.3d 1227, 1235 (11th Cir. 2018) (quoting *Ramsey*, 431 U.S. at 620).

Even before the Fourth Amendment was adopted, border searches were considered reasonable "by the single fact that the person or item in question had entered into our country from the outside."  *Ramsey*, 431 U.S. at 619.  As a result, "[t]he Supreme Court has consistently held that border searches are not subject to the probable cause and warrant requirements of the Fourth Amendment."  *United States v. Vega-Barvo*, 729 F.2d 1341, 1344 (11th Cir. 1984) (citing *Ramsey*, 431 U.S. at 619).  This does not mean that safeguards to protect an individual's privacy at the border do not exist, however.  For a border search to be lawful, it must be: (1) authorized by statute, and (2) reasonable under the Fourth Amendment. *United States v. Alfaro-Moncada*, 607 F.3d 720, 726 (11th Cir. 2010) (citing *Ramsey*, 431 U.S. at 606, 611-16).

Here, Falzone does not dispute the first element and focuses instead on the second. To determine whether a border search is reasonable under the Fourth Amendment, courts weigh the extent to which the search intrudes upon an individual's privacy against legitimate government interests.  *Alfaro-Moncada*, 607 F.3d at 727.  An individual's right to privacy at

6

the border is "qualitatively different" than inside the country. *Montoya de Hernandez*, 473 U.S. at 538. "At the border, an individual has a lesser expectation of privacy, the government has a greater interest in searching, and the balance between the interests of the government and the privacy right of the individual is struck more favorably to the government." *Alfaro-Moncada*, 607 F.3d at 726 (citing *Montoya de Hernandez*, 473 U.S. at 539-40).

The Eleventh Circuit recognizes the distinction between border searches of a person's body and of a person's property. The search of a person's property during a border search, "however non-routine and intrusive," requires no level of suspicion. *Touset*, 890 F.3d at 1233. This includes forensic searches of electronic devices. *Id.* ("We see no reason why the Fourth Amendment would require suspicion for a forensic search of an electronic device when it imposes no such requirement for a search of other personal property. . . . [I]t does not make sense to say that electronic devices should receive special treatment because so many people now own them or because they can store vast quantities of records or effects."). In contrast, "highly intrusive searches of a person's body" at the border require reasonable suspicion, such as "a strip search or an x-ray examination." *Id.* at 1234 (quoting *Alfaro-Moncada*, 607 F.3d at 729).

To get around *Touset*'s bright line rule that the forensic search of an electronic device during a border search does not require reasonable suspicion, Falzone argues that when HSI searched his phone – two days after seizing it and 140 miles away from his point of entry into the United States – it conducted an *extended* border search that required either probable cause or reasonable suspicion. Both sides agree that officials may conduct a border search at any place that constitutes the functional equivalent of the border (an airport, for example, is the

7

functional equivalent of a border). "An extended border search, however, is a search that occurs beyond the functional equivalent of the border. An extended border search may not be conducted unless the officials have a reasonable suspicion of criminal activity." *United States v. Santiago*, 837 F.2d 1545, 1548 (11th Cir. 1988).

Three factors determine if a search occurred at the functional equivalent of the border: (1) reasonable certainty that the border was crossed; (2) lack of time or opportunity for the object to have changed materially since the time of crossing, and (3) performance of the search at the earliest practical point after the border is crossed. *Id*. Here, there is no dispute the first factor occurred (*see* Doc. 25 at 8). Falzone entered the United States at the Port Canaveral seaport after an international cruise. Regarding the second factor, CBP officers asked Falzone at the border to put his phone in airplane mode. After opening his phone's settings application, agents observed Falzone holding the phone for longer than it would take to select airplane mode and moving his thumb up and down the screen. Worried Falzone would delete content, HSI took the phone and put it in airplane mode, where it remained. Against this factual backdrop, Falzone does not challenge the second factor (*Id*.).

The issue turns on the third factor, whether agents searched Falzone's phone at the earliest practical point inside the United States. Falzone cites one unpublished district court case from within the Eleventh Circuit that found the Government's hypothetical second search of the defendant's tablet would fall under the extended search doctrine and require reasonable suspicion (Doc. 25 at 8).[2] *See United States v. Wallace*, No. 1:12-cr-230-TWT-LTW,

---

[2] The other cases Falzone cites for this proposition are outside the Eleventh Circuit and all but one are unpublished (*see* Doc. 25 at 8). The Court has reviewed them and finds them unpersuasive.

8

2013 WL 1707904, at *7 (N.D. Ga. Mar. 21, 2013), *report and recommendation adopted*, 2013 WL 1702791, at *1 (N.D. Ga. Apr. 19, 2013).  In *Wallace*, after finding cocaine in the defendant's luggage, CBP officers searched the defendant's tablet (which was not password protected) and phone (which was password protected) at the Atlanta airport before reading him his *Miranda* rights. *Id*. at *3-4.  The court found the warrantless search of the tablet was a valid border search but suppressed evidence found on the phone because officers asked for and obtained the phone's password before reading the defendant his *Miranda* rights.  Later, CBP "was unable to specify whether the telephone numbers, contacts, recent calls, and email addresses on a log [officers] created during [the] search came from Defendant's telephone or tablet[,]" and wanted to do a second tablet search at HIS's Atlanta headquarters months later. *Id*. at *6.

Without discussion, the *Wallace* court held that an additional tablet search would fall under the extended search doctrine and require reasonable suspicion. *Id*. at *7.  The court found the Government did not "run[ ] afoul of this doctrine" and had reasonable suspicion to conclude the defendant "was involved in illegal activity based on the cocaine and cash discovered in his luggage and that Defendant may have used his tablet as part of his efforts to smuggle narcotics into the United States." *Id*.  The court stated: "For all practical purposes, there is no difference between the Government's additional review of Defendant's tablet now and CBP Officer Wolfe's initial search of Defendant's tablet at Hartsfield airport." *Id*.

The United States cites *United States v. Brown*, No. 1:20-cr-113-SDG-JSA, 2021 WL 3828797 (N.D. Ga. Aug. 27, 2021), another unpublished Northern District of Georgia case (Doc. 35 at 7).  In *Brown*, the district judge found that HSI agents' search of the defendant's

9

electronic devices two weeks after the initial border search did not constitute a warrantless search incident to arrest prohibited by *Riley v. California*, 573 U.S. 373 (2014). *Brown*, 2021 WL 3828797, at *3. In *Riley*, the Supreme Court held that the search-incident-to-arrest exception does not apply to cell phone searches because of countervailing privacy concerns. But *Touset* clarifies that *Riley* does not apply at the border. *See* 890 F.3d at 1233. And, as the *Brown* court explains, "'the border exception is not rendered inapplicable because a search initiated at a border ultimately is conducted at some physical or temporal remove.'" *Brown*, 2021 WL 3828797, at *3 (quoting *United States v. Kolsuz*, 890 F.3d 133, 142 (4th Cir. 2018) (collecting cases)).[3]

In *Brown*, based on a tip that the defendant was attempting to export child pornography, HSI agents at the Atlanta airport stopped him at his boarding gate before his flight to the Philippines.[4] *Id.* at *1. Agents escorted the defendant to an interview room, placed his phone and tablet on airplane mode, and asked the defendant to unlock them. *Id.* at *2. He did so and confirmed the devices may contain child pornography. *Id.* Agents who searched the devices manually and with Cellebrite found no contraband at first, so they permitted the defendant to leave but kept the devices. *Id.* Two days later, agents extracted "messages suggesting that Brown was traveling to the Philippines to engage in commercial sex with minors" from his phone and arrested him. *Id.* Then, two weeks after the defendant's

---

[3] *Kolsuz* finds that the search of an electronic device at the border is a nonroutine search that requires reasonable suspicion. This is not the law in the Eleventh Circuit, *see Touset*, 890 F.3d at 1233, and the Court does not cite *Kolsuz* for that proposition.

[4] "Every circuit that has considered the question has ruled that the rationales for the border exception apply both to incoming and outgoing persons and instrumentalities." *United States v. Hernandez-Salazar*, 813 F.2d 1126, 1137 (11th Cir. 1987).

arrest, an HSI forensic analyst conducted a more detailed, off-site forensic search that uncovered more evidence. *Id.* at \*3.

The defendant moved to suppress the off-site search of his electronic devices as an unconstitutional warrantless search incident to arrest. The *Brown* court found that his arrest did not transform the border search of his phone into a search incident to arrest, triggering *Riley* and calling for a search warrant based on probable cause. *Id.* Even though a continued search of the defendant's phone "occurred physically and temporally removed from the border[,]" the *Brown* court emphasized "Brown never 'regained an expectation of privacy in' his phone because the border search was continuous." *Id.*; *cf. United States v. Quarles*, No. 21-cr-13-TPB-AEP, 2022 WL 3684661, at \*1-2 (M.D. Fla. Aug. 25, 2022) (finding reasonable suspicion not required for border search of electronic device, denying motion to suppress search of cell phone CBP agents seized at Port Canaveral and HSI searched in Tampa); *United States v. Pulido*, No. 20-cr-292-VMC-CPT, 2021 WL 3476600 (M.D. Fla. Jul. 2, 2021) (finding search of electronic device fell within border search exception even though agents found evidence of contraband but no contraband, denying motion to suppress forensic search of cell phone seized at Dallas/Forth Worth airport and transferred to Tampa for analysis), *report and recommendation adopted*, 2021 WL 3471696, at \*1 (M.D. Fla. Aug. 6, 2021). In other words, the extended border search doctrine did not apply; the government did not need reasonable suspicion to search the electronic devices. *Brown*, 2021 WL 3828797, at \*3-4.

Underpinning the *Brown* court's holding was that the justification of both the government's search and its continued search two weeks later was the same: to prevent the importing or exporting of contraband. *Id.* at \*3. The agents in *Brown* – as here – did not

11

connect the defendant's phone to the internet or to any cloud-based accounts after seizing it, and "the search fell within the permissible bounds of what existed on the hardware of the phone itself." *Id.* at *4. The search was squarely within "the purpose of the border search exception, which is to uncover contraband at the border to prevent importation or exportation." *Id.*

Here, HSI's search of Falzone's phone at its Tampa office was a valid border search that did not require reasonable suspicion. CBP Officers and HSI Agents stopped Falzone immediately upon his reentry to the United States at Port Canaveral to search his property for child pornography, contraband the United States has a clear interest in keeping out of the country. Because the technology needed to conduct a forensic search of the cell phone was not available at Port Canaveral (and there were software problems associated with the Cellebrite technology on HSI SA Angelosanto's laptop), the Government transported the phone to HSI's Tampa office where it had software capable of bypassing the phone's passcode for a forensic search. Although that search occurred two days later and 140 miles away, the phone never cleared customs. *See United States v. Stewart*, 729 F.3d 517, 525 (6th Cir. 2013) (finding that agents did not conduct an extended border search of laptops that never "cleared the border," even though agents transported them 20 miles past the border and examined them 24 hours later). Given the lack of technology at Port Canaveral, the forensic search of Falzone's phone occurred at the earliest practical point after the border was crossed. The miles between Port Canaveral and Tampa, and the two days between Falzone's border crossing and HSI's forensic search of his cell phone, do not transform what was a valid border search into an extended border search.

Even if the search was an extended border search (it was not), the United States had reasonable suspicion to conduct the forensic search at HSI's Tampa office. When SA Angelosanto showed Falzone a screenshot of the "sexo por gay puto boys hots" group on Viber, which included an image of child pornography, Falzone confirmed it is his phone number tied to the "Joshua" account and stated he was aware of the group chat. In addition, Falzone was heard to say to his fiancé, "we have to talk when we get outside. I understand if you don't want to marry me now." (Doc. 35-7). Falzone's acknowledgment of the "sexo por gay puto boys hots" group chat containing child pornography and the confirmation of his cell phone number used by the "Joshua" account, gave rise to a reasonable suspicion that Falzone's phone contained child pornography.

Last, even if HSI's search of Falzone's phone ran afoul of the Fourth Amendment (as explained above, it does not for numerous reasons), the good faith exception to the exclusionary rule applies. *Davis v. United States*, 564 U.S. 229, 236-37 (2011) (holding that the fruits of "a search conducted in reasonable reliance on binding precedent [are] not subject to the exclusionary rule."). HSI had an objectively good faith belief that its warrantless search of Falzone's phone at the border and again at its Tampa office did not violate the Fourth Amendment, because under Eleventh Circuit precedent, neither a warrant, probable cause, nor reasonable suspicion is required for a forensic search of an electronic device at the border. *See Touset*; 890 F.3d at 1227; *United States v. Touray*, 1:20-cr-103-TWT-LTW, 2021 WL 6066101, at *12 (N.D. Ga. Sept. 3, 2021) (recommending denying motion to suppress evidence obtained from forensic search of defendant's phone at Atlanta airport because, *inter*

13

*alia*, "even if B. Touray's argument were correct . . . the *Leon* good faith exception would apply."), *report and recommendation adopted*, 2021 WL 5195645 (N.D. Ga. Nov. 8, 2021).

## CONCLUSION

The undersigned recommends that Defendant James Falzone's Motion to Suppress (Doc. 25) be DENIED.

**REPORTED** in Tampa, Florida on July 29, 2024.

SEAN P. FLYNN
UNITED STATES MAGISTRATE JUDGE

## **NOTICE TO PARTIES**

Within fourteen days after being served with a copy of this Report and Recommendation, any party may serve and file written objections to the proposed findings and recommendations or request an extension of time to do so.  28 U.S.C. § 636(b)(1); 11th Cir. R. 3-1.  Failure of any party to timely object in accordance with the provisions of § 636(b)(1) waives that party's right to challenge on appeal the district court's order based on the unobjected-to factual and legal conclusions contained in this Report and Recommendation.  11th Cir. R. 3-1.

cc:   Hon. Virginia Covington, United States District Judge